Filed 2/4/22; certified for publication 3/1/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOSE MARIO MENDOZA, | H044372 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 1-15 CV281073) |
| v. | |
| TRANS VALLEY TRANSPORT et al., | |
| Defendants and Appellants. | |

In this wage and hours class action, we consider whether an arbitration provision in an employee handbook, coupled with acknowledgement forms the class representative signed, created a legally binding agreement to arbitrate the claims presented. Defendants and appellants Trans Valley Transport (Trans Valley) and FTU Labor Contractors, Inc. (FTU, jointly "Employers") appeal from the trial court's order denying their petition to compel arbitration of a putative class action brought by a former employee—plaintiff and respondent Jose Mario Mendoza—on behalf of truck drivers employed by Trans Valley and FTU. The trial court found that the parties had not entered into a binding agreement to arbitrate.

On appeal, Employers contend, based on a delegation clause in the arbitration policy described in FTU's employee handbook, that the question whether the parties had agreed to arbitrate is for the arbitrator, not a court, to decide. They also argue that the

1

parties entered into an express agreement to arbitrate based on the arbitration clause in the handbook and the acknowledgement forms. Alternatively, they argue that Mendoza entered into an implied-in-fact agreement to arbitrate when he received the handbook and worked for the company. Finally, they argue that the Arbitration Policy is not unconscionable.

We conclude that Employers have forfeited their delegation clause argument by reserving the issue for their reply in the trial court and not adequately briefing the issue below or on appeal. However, we exercise our discretion to address the issue on the merits, and hold that it was for a court to decide whether the parties had entered into an agreement to arbitrate. We also conclude that in the circumstances of this case, the parties have not entered into either an express or an implied contract to arbitrate their disputes. We will therefore affirm the trial court's order denying the motion to compel arbitration.

## I. FACTS

### A. *Mendoza's Job Application*

Mendoza applied for employment with FTU as a truck driver in June 2012. At that time, he met with a company owner and a supervisor. Mendoza speaks Spanish and cannot read or write English. He therefore could not read or fill out FTU's 4-page employment application form. Mendoza told the owner and the supervisor he could not speak or read English. One or both of them spoke Spanish; they interviewed Mendoza and filled out the application form for him.

According to that application, Mendoza's highest level of education was the sixth grade in El Salvador; he also went to truck driving school. Mendoza signed page 4 of the employment application. There were several paragraphs above the signature line, which included the following: "I certify that I have read and understood all of this employment application. [¶][¶] If hired, I agree to abide by all the rules and policies of the employer."

FTU's work is seasonal; most of the truck drivers are hired in February and let go in November. FTU hired Mendoza as a temporary, interstate truck driver on September 4, 2012. Mendoza worked for FTU for six weeks in September and October 2012, and from March until August in 2013 (6 months), and from March until July in 2014 (5 months).

### B. Events on Date of Hire

FTU's evidence included the declaration of Allen Rusler, FTU's director of human resources. Rusler stated that he met with each new hire for 45 to 90 minutes to go over the employment documents, including the employee handbook (Handbook). If the new hire did not speak English, an FTU employee translated for Rusler during the meeting. During his meeting with each new hire, Rusler went over each provision in the Handbook, including the arbitration policy. After reviewing the Handbook, Rusler asked whether the employee had any questions, and after answering any questions, Rusler had the employee sign the acknowledgement forms. Rusler's custom and practice in 2012 was to give Spanish-speaking employees a Spanish-language version of the Handbook, and he declared that Mendoza "would have been provided a Spanish version of the . . . Handbook" when he was hired.

Mendoza did not recall receiving a copy of the English-language version of the Handbook, but stated it is possible it was in a packet of documents he was given when he was hired. Mendoza denied that he was ever given the Spanish-language version of the Handbook.

### C. Text of Handbook and Arbitration Policy

The first page of the 63-page FTU Employee Handbook began with the salutation "**Welcome to FTU!**" and stated in relevant part: "Your FTU handbook is designed for quick reference and general information. It is not intended as a contract of employment and does not provide in detail all of the Company's policies. However, it does provide an

3

overview about many of the Company's personnel procedures, practices and policies that affect your employment. [¶] The information contained in this handbook summarizes policies, which are subject to changes and/or to deletions from time to time with the exception of the Company's at-will employment policy. . . . Consequently, all terms and conditions of your employment may be changed or withdrawn at [the] company's unrestricted option at any time, with or without good cause."

The following statement appeared at the top of page 2 of the Handbook: "**THE POLICIES BELOW ARE A CONDITION OF EMPLOYMENT WITH THE COMPANY**" (emphasis original). That statement is followed by several sections with the following headings: "**At-Will Employment Policy,**" "**Binding Arbitration Policy**" (Arbitration Policy), "**An Equal Opportunity Employer**," "**Protecting Our Union-Free Environment**," "**Customer Service and Safety,**" **SAFETY POLICY,** and others (emphasis original).

The Arbitration Policy, which was two and a half pages long and started on page 2 of the Handbook, began with the following: "The Company utilizes a system of alternative dispute resolution which involves binding arbitration to resolve all disputes which may arise out of the employment context. Because of the mutual benefits (such as reduced expense and increased efficiency) which private binding arbitration can provide both the Company and the employee, employee and the Company both agree that any claim, dispute, and/or controversy that either party may have against one another (including, but not limited to, any claims of discrimination and harassment, whether they be based on the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964, as amended, as well as all other applicable state or federal laws or regulations) which would otherwise require or allow resort to any court or other governmental dispute resolution forum between the employee and the Company (or its owners, directors, officers, managers, employees, agents, and parties affiliated with its employee benefit and health plans) arising from, related to, or having any relationship or connection

4

whatsoever with your seeking employment with, employment by, or other association with the Company whether based on tort, contract, statutory, or equitable law, or otherwise, (with the sole exception of claims arising under the National Labor Relations Act which are brought before the National Labor Relations Board, claims for medical and disability benefits under the California Workers' Compensation Act, and Employment Development Department claims) shall be submitted to and determined exclusively by binding arbitration."[1]

The Arbitration Policy prohibited class, collective, and joint actions. It did not prohibit administrative claims and investigations, including NLRB, DFEH, or EEOC claims, but provided that after administrative remedies are exhausted, such claims must go to arbitration. The Arbitration Policy did not mention wage and hour claims. The Arbitration Policy contained terms regarding arbitration procedures, discovery, arbitrator qualifications and immunity, extensions of time, the arbitrator's decisions, the allocation of costs and arbitrator fees, a waiver of the third-party exception in Code of Civil Procedure section 1281.2, subdivision (c), and a delegation clause. The Arbitration Policy concluded with the following language in all caps: "EMPLOYEE UNDERSTANDS BY BEING EMPLOYED BY THE COMPANY, AS A CONDITION OF EMPLOYMENT, THE EMPOLYEE [*sic*] AGREES TO THIS BINDING ARBITRATION POLICY, WHICH MEANS THE EMPLOYEE AND THE COMPANY BOTH GIVE UP RIGHTS TO TRIAL BY JURY AND RIGHTS TO PARTICIPATE IN CLASS ACTION CLAIMS."

In addition to the Arbitration Policy, the Handbook described FTU's safety policy, its alcohol and drug testing policy, employee benefits, company rules and regulations, additional rules and regulations for truck drivers, and its "Driver Safety Service Awards

---

[1] The second sentence of the paragraph we just quoted is 214 words long and occupies 22 lines of text in the Handbook.

5

Program."  Neither the Arbitration Policy nor the Handbook had signature lines for employees or FTU to sign.

### D. *Forms Mendoza Signed When Hired*

Employers' motion to compel arbitration relied on four documents Mendoza signed when he was hired:  two acknowledgement forms and two checklist forms, all of which were written in English.  There was no Spanish-language version of those forms.  The first acknowledgement form was a two-page document entitled "Notice and Acknowledgement" (First Acknowledgement).  It advised Mendoza that he was employed by "FTU . . ./PeopLease" and that the company "outsources certain employer-related functions to PeopLease."  The First Acknowledgment stated in relevant part:  "You will be required to abide by all applicable rules and policies, including but not necessarily limited to those set forth in the [Handbook]."  Above the signature line, the form stated, "I have read the above Notice and Acknowledgment and agree to its terms."

The second acknowledgment form was entitled "Employee Acknowledgement" (Second Acknowledgment).  It stated:  "This is to acknowledge that I·have received my personal copy of the . . . Employee Handbook[].  In consideration of my employment with the Company, I hereby agree to read, observe, and abide by the conditions of employment, policies and rules contained in this Handbook.  I understand that this Handbook is designed for quick reference and that it sets forth many but not all of the Company's policies and guidelines under which the Company operates.  I also acknowledge that this handbook and the policies contained herein are not in any way intended as a contract of employment.  [¶]  I understand that the policies and procedures described in this handbook are for purposes of information only, and with the exception of the Company's at-will employment policy, may be amended or modified by the Company at any time, with or without prior notice."

6

When first hired on September 4, 2012, Mendoza also signed a "Driver New Hire/Rehire Checklist," which listed 15 documents he filled out or received in the hiring process, including the Handbook. (The checklist did not state whether Mendoza received the English- or Spanish-language version of the Handbook.) Just before the signature line, the checklist stated: "I acknowledge I have received all items listed above and questions regarding these items have been explained to me to my satisfaction." Mendoza signed an almost identical checklist when he was rehired on March 6, 2014.

Mendoza does not dispute that he signed the acknowledgement forms and the checklists. In a declaration, he stated that he could not read any of these forms and did not understand them. He also declared, "When they gave me these documents, I was not given any translation of the documents or explanation about what they said. I was only told that they had something to do with insurance and I had to sign them if I wanted to work for [Trans Valley]."[2] Mendoza also declared that no one ever said anything to him "about signing any kind of contract . . . or entering into an arbitration agreement." He had no intention of signing a contract or agreeing to arbitration. All he knew is he had to sign the documents they gave him, which he could not read, if he wanted to work for Trans Valley.

## II. PROCEDURAL HISTORY

In May 2015, Mendoza filed a putative class action complaint against Trans Valley and FTU (hereafter jointly Employers) asserting claims on behalf of truck drivers

---

[2] FTU's evidence included a form entitled "FTU . . . DOT Qualified Driver File Checklist," which contained a list of 20 documents described as "[p]aperwork needed in files." Number 15 on the list was "Employee Acknowledgment handbook receipt." The words "Checked by," the dates "12-18-12" and "12-18-13," and an unidentified person's initials were on the bottom of the form. Mendoza declared that the initials on the form were not his, he did not fill out this form, and was not even working for the company on the two dates indicated.

who worked for Employers. In June 2015, the trial court issued an order deeming the case a complex civil case and staying discovery.

A few months later, Mendoza filed a first amended complaint (the operative pleading), which alleged causes of action for: (1) failure to pay minimum wages (Lab. Code, §§ 1194, 1197); (2) failure to provide rest periods (Lab. Code, § 226.7); (3) failure to provide meal periods (Lab. Code, § 226.7); (4) unfair competition (Bus. & Prof. Code, § 17200 et seq.); (5) failure to provide accurate wage statements (Lab. Code, § 226); and (6) failure to pay all wages owed upon termination (Lab. Code, §§ 201-203). Employers answered the first amended complaint, and FTU filed a cross-complaint against PeopLease, LLC (PeopLease). PeopLease answered the cross-complaint.[3]

In May 2016, Employers filed a motion to compel arbitration and to stay the litigation, which was heard in November 2016. The evidence in support of the motion consisted of the declaration of Employers' counsel, in which she purported to authenticate FTU's documents.[4]

Mendoza opposed the motion, arguing that the Handbook, which stated that it was not a contract and was merely for informational purposes, did not create a binding agreement to arbitrate. He argued that any agreement to arbitrate was void for lack of mutual consent or voidable on the grounds of unilateral mistake, that he was deceived into signing the acknowledgement forms, and that the class action waiver was not

---

[3] None of the pleadings are in the record. On the court's own motion, we have augmented the record to include a copy of the first amended complaint, which we obtained from the trial court. We have also taken judicial notice of the trial court's register of actions as of February 8, 2017, a copy of which was attached to appellant's notice of appeal lodged in this court. (Evid. Code, §§ 452, subd. (d); 459.) Our description of the pleadings is based on those documents.

[4] Employers' evidence included a blank copy of a 3-page arbitration agreement form. Their moving papers stated that starting in March 2015—after Mendoza left FTU—Employers started having their employees sign a "Binding Arbitration Agreement" that was separate from the Handbook. Employers did not claim that Mendoza "signed or even received" that agreement.

enforceable. Mendoza objected to Employers' evidence on the grounds that it was hearsay and lacked foundation, that Employers' counsel lacked personal knowledge of the matters stated in her declaration, and that FTU's documents had not been properly authenticated.

In reply, Employers argued that an agreement to arbitrate may be based on the acknowledgement of receipt of an employee handbook where, as in this case, the arbitration policy is a condition of employment and the employee accepted the position. They asserted that it did not matter that Mendoza could not read or speak English, that he signed the documents at his own peril, that his signature was a manifestation of his assent, and that Employers were entitled to rely on his assent. They argued that there was no unilateral mistake, since Mendoza knew his English was limited, but signed the documents anyway. Employers argued, for the first time, under a heading about the enforceability of the class action waiver, that under the Arbitration Policy's delegation clause, questions regarding the validity and enforceability of the arbitration agreement—including the class action waiver—were for the arbitrator to decide, not the court.

The trial court found that the declaration of Employers' counsel "provides no indication that [counsel was] personally familiar with or able to authenticate FTU documents" and sustained Mendoza's objections to Employers' evidence. The trial court held these were "fundamental defects" that required the denial of the motion. The court also provided "its view on the parties' substantive arguments" and concluded that a handbook that the employer itself characterizes "as informational and non-contractual in nature should not be construed as a contract." The court held "that where an arbitration provision is provided to an employee within a handbook that is repeatedly characterized as noncontractual in nature, and the employee receives no other form of notice that he will be deemed to have consented to arbitration by commencing or continuing his employment, there is no 'clear' agreement to arbitrate." The trial court denied the motion without prejudice "so that the evidentiary issues could be cured."

9

Employers filed a second motion to compel arbitration and stay the litigation. Their moving papers included the declaration of Rusler, who had personal knowledge of the documents used in the hiring process. Employers argued that the Handbook and the forms Mendoza signed created an express agreement to arbitrate, since the Arbitration Policy was a condition of Mendoza's employment. Alternatively, they argued that the Handbook and other documents created an implied agreement to arbitrate, which Mendoza consented to by working for FTU. Finally, Employers argued the Arbitration Policy was not unconscionable and therefore enforceable. Employers did not present any argument regarding the delegation clause in their moving papers for their second motion.

In opposition to the second motion, Mendoza argued that it did not matter that the Arbitration Policy described arbitration as a condition of the employment because the Arbitration Policy provided that its terms could be changed at any time by Employers, and since the forms he actually signed did not mention arbitration, they did not put him on notice that he was bound by the Arbitration Policy. Mendoza renewed his contentions that the Arbitration Policy failed for lack of mutual consent or based on unilateral mistake and that the class action waiver was unenforceable. Mendoza did not respond to Employers' unconscionability argument.

As before, Employers argued in their reply, under a heading about the class action waiver, that under the Arbitration Policy's delegation clause, the validity and enforceability of the Arbitration Policy, as well as the question whether the class action waiver is enforceable, are for the arbitrator, not the court to decide.

The trial court adopted its prior order and denied the motion to compel arbitration. The court's orders did not address Employers' contention that the agreement was not unconscionable or their assertions regarding the delegation clause. Employers did not

10

request a statement of decision under Code of Civil Procedure section 1291.[5]  Employers timely appealed.

### III.   DISCUSSION

#### A.  *Employers' Contentions on Appeal*

Employers raise four issues on appeal.  First, based on the delegation clause in the Arbitration Policy, they argue that the trial court lacked jurisdiction to determine the enforceability of the Arbitration Policy because the parties had delegated that question to the arbitrator.  Second, they allege that there was a binding agreement to arbitrate.  Based on the language of the acknowledgement forms and the Arbitration Policy, Employers assert that there was an express agreement to arbitrate.  Alternatively, citing *Harris v. Tap Worldwide LLC* (2016) 248 Cal.App.4th 373 (*Harris*), they argue that Mendoza entered into an implied-in-fact agreement to arbitrate when he received the Handbook and worked for the company.  Third, Employers assert that Mendoza's signature on the acknowledgement and checklist forms constituted an objective manifestation of his understanding and consent to arbitration, in spite of the fact that he could not read or understand the forms.  Fourth, they argue that the Arbitration Policy is not unconscionable.  Employers urge us to reverse the trial court's order denying the motion to compel arbitration and direct it to order the matter to arbitration.

#### B.  *The California Arbitration Act Applies in this Case*[6]

Both state and federal law have statutory schemes for the enforcement of arbitration agreements.  The California Arbitration Act (§§ 1280 et seq., sometimes

---

[5] All undesignated statutory references are to the California Code of Civil Procedure.

[6] Although not raised by the parties, we determine that the arbitration agreement applies to Trans Valley, and it was entitled to compel arbitration.  The employment application, Handbook, acknowledgement forms, and checklists all state that the employer is FTU and do not mention Trans Valley.  The Handbook and other forms refer to the "Company" but do not expressly define who the company is.  But since *both* FTU and Trans Valley moved to compel arbitration, we conclude that Trans Valley has

11

CAA) sets forth "a comprehensive statutory scheme regulating private arbitration in this state." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 (*Moncharsh*).) The Federal Arbitration Act (FAA, 9 U.S.C. §§ 1-14) governs contractual arbitration in written contracts involving interstate or foreign commerce. (9 U.S.C. §§ 1, 2.)

As a threshold matter, we must determine which body of law—the FAA or the CAA—applies to the issues presented here, since the two statutory schemes apply different standards and presumptions. The FAA embodies a strong federal policy favoring arbitration. "Congress enacted the FAA in 1925 to remedy the general hostility of American courts to the enforcement of arbitration agreements. To effectuate that purpose, the FAA compels judicial enforcement of a wide range of written arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. (*Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105, 111 . . . (*Circuit City*); [citation].) When the FAA applies, it preempts any state law rule that ' "stand[s] as an obstacle to the accomplishment of the FAA's objectives." ' " (*Muller v. Roy Miller Freight Lines, LLC* (2019) 34 Cal.App.5th 1056, 1062 (*Muller*).)

"The FAA's basic coverage provision, section 2, makes the FAA applicable to contracts 'evidencing a transaction involving commerce.' (9 U.S.C. § 2.) Courts broadly construe section 2 to 'provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause.' [Citation.] 'Accordingly, in most cases, the FAA mandates arbitration when contracts involving interstate commerce contain arbitration provisions.' " (*Muller*, *supra*, 34 Cal.App.5th at p. 1062, citing *Performance Team Freight Systems, Inc. v. Aleman* (2015) 241 Cal.App.4th 1233, 1239 (*Performance Team*).)

---

voluntarily joined in the arbitration proceeding that FTU seeks to compel. (*Lovret v. Seyfarth* (1972) 22 Cal.App.3d 841, 859-860 [a person who has not signed an arbitration agreement but who voluntarily joins in an arbitration proceeding may be estopped to deny that it is a party to the agreement and bound by the award].)

But section 1 of the FAA provides a narrow, limited exemption from FAA coverage for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (9 U.S.C. § 1; *Muller*, *supra*, 34 Cal.App.5th at p. 1062.) The catchall phrase "any other class of workers engaged in foreign or interstate commerce" in section 1 does not refer to *all* workers involved in foreign or interstate commerce, but rather only to "transportation workers," which means "those workers ' "actually engaged in the movement of goods in interstate commerce." ' " (*Muller*, at p. 1062, citing *Circuit City*, *supra*, 532 U.S. at pp. 112, 121, 119.)

"Courts are somewhat divided on whether and when truckers and delivery drivers qualify as 'transportation workers.' If a truck driver physically transports goods across state lines, he or she undoubtedly qualifies as a transportation worker under section 1." (*Muller*, *supra*, 34 Cal.App.5th at p. 1065; *id*. at pp. 1068-1069 [truck driver who worked for "a licensed motor carrier company" and who transported goods that originated across state lines but did not personally transport goods state to state was a transportation worker because he played "an integral role in transporting those goods through interstate commerce"]; see also *Performance Team, supra*, 241 Cal.App.4th at p. 1240 [the most obvious case where the exemption applies is where the plaintiff directly transports goods in interstate commerce, such as an interstate truck driver]; *Nieto v. Fresno Beverage Co., Inc*. (2019) 33 Cal.App.5th 274 (*Nieto*) [exemption applied to delivery driver making deliveries exclusively within California where the employer sold and distributed goods that originated in other states and countries]; *Betancourt v. Transportation Brokerage Specialists, Inc*. (2021) 62 Cal.App.5th 552 [exemption applied to "last-mile delivery" driver who transported packages from distribution warehouse to buyers since goods originated from all over the United States].)

While the First Acknowledgment described Mendoza's position as "Interstate truck driver," there is no evidence in the record on the question whether Mendoza

13

transported goods across state lines or regarding the nature or origin of the goods he transported. The Arbitration Policy states that the "Company's business and the nature of your employment in that business affects interstate commerce," the "arbitration shall be controlled by" the FAA, and "[a]ny arbitration proceeding will move forward under the Federal Arbitration Act." In response to our request for supplemental briefing, the parties agree that despite the language of the Arbitration Policy, Mendoza and the putative class members are transportation workers within the meaning of section 1 of the FAA and that the FAA therefore does not apply in this case. We shall therefore analyze the issues presented under the CAA and California law.

## C. General Principles Under the CAA and the Standard of Review

"California law strongly favors arbitration. Through the comprehensive provisions of the California Arbitration Act (. . . § 1280 et seq.), 'the Legislature has expressed a "strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution." ' (*Moncharsh*[, *supra*,] 3 Cal.4th 1, 9 . . . .) As with the FAA . . . , California law establishes 'a presumption in favor of arbitrability.' (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971 . . . [(*Engalla*)].)" (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125 (*OTO*).)

Under the California Arbitration Act, a written agreement to submit a controversy to arbitration "is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (§ 1281.) " ' "[G]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening" the FAA' or California law." (*OTO*, *supra*, 8 Cal.5th at p. 125.) A party to an arbitration agreement may petition the trial court to order the parties to the agreement to arbitrate a controversy that is covered by the agreement. (§ 1281.2.) The court shall order arbitration, unless it determines that the right to compel arbitration has been waived by the petitioner, that grounds exist for rescission of the agreement, or that a

14

party to the agreement is also a party to a pending court action or special proceeding with a third party.  (§ 1281.2.)

Through the CAA, "the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citations.]  Consequently, courts will ' "indulge every intendment to give effect to such proceedings." ' " (*Moncharsh*, *supra*, 3 Cal.4th at p. 9.)  The scope of arbitration is a matter of agreement between the parties and the powers of an arbitrator are limited and circumscribed by the agreement or stipulation to arbitration.  (*Id.* at pp. 8-9.)

"The trial court may resolve motions to compel arbitration in summary proceedings, in which . . . 'the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination.' " (*Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676, 683 (*Lane*), quoting *Engalla*, *supra*, 15 Cal.4th at p. 972.)  The party seeking arbitration bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability by a preponderance of the evidence.  (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*); *Engalla*, at p. 972.)  While the FAA preempts both state judicial rulings and legislation disfavoring arbitration, "the CAA, being a state statute, 'obviously does not prevent our Legislature from selectively prohibiting arbitration in certain areas.' " (*Tiri v. Lucky Chances, Inc.* (2014) 226 Cal.App.4th 231, 249, fn. 12 (*Tiri*), quoting *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 98 (*Armendariz*), abrogated in part on another ground in *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 339-340.)

Although "California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration,"

[citation] there is no public policy "that favors the arbitration of disputes the parties did not agree to arbitrate. [Citation.]" (*Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890 (*Aanderud*).) The party opposing arbitration has the burden to show the arbitration provision cannot be interpreted to cover the claims in the complaint. (*Ibid.*)

" 'When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.' " (*Aanderud*, *supra*, 13 Cal.App.5th at p. 890, quoting *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 (*First Options*).) An arbitration agreement is governed by contract law. It is construed like other contracts to give effect to the intention of the parties and the ordinary rules of contract interpretation apply. (*Aanderud*, at p. 890.) If the contractual language is clear and explicit, it governs. (*Ibid.*, citing Civ. Code, § 1638 & *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) "A petition to compel arbitration is simply a suit in equity seeking specific performance of a contract." (*Aanderud*, at p. 890.)

"An order denying a petition to compel arbitration is appealable. (. . . § 1294, subd. (a).) When a trial court's order is based on a question of law, we review the denial de novo. [Citation.] Decisions on issues of fact are reviewed for substantial evidence. [Citation.]" (*Performance Team*, *supra*, 241 Cal.App.4th at p. 1239.) "Where . . . the evidence is not in conflict, we review the trial court's denial of arbitration de novo." (*Pinnacle*, *supra*, 55 Cal.4th at p. 234.)

### D. The Delegation Clause: Whether the Trial Court Had Jurisdiction to Determine Whether the Parties Entered into an Agreement to Arbitrate

#### 1. Delegation Clauses

Employers argue that the "trial court lacked jurisdiction to determine the enforceability of the Arbitration Policy" because the Arbitration Policy contains a delegation clause and the "delegation clause states that the arbitrator, and not the court, will determine whether a claim is arbitrable." Employers rely on the following paragraph

16

in the Arbitration Policy: "The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of the arbitration policy, including without limitation any claim that this policy is void or voidable. Thus, the Company Employee [*sic*] voluntarily waive the right to have a court determine the enforceability and/or scope of this policy."

It is well-settled under both state and federal law "that absent the parties' commitment of the arbitrability decision to an arbitrator, disagreements over whether a particular dispute is within the scope of an arbitration provision are ordinarily the responsibility of a court." (*Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 249 (*Sandquist*), questioned on another ground as stated in *Lamps Plus, Inc. v. Varela* (2019) 587 U.S. ___, ___ [139 S.Ct. 1407, 1415-1417] (*Lamps Plus*).) There is a "strong presumption that courts should determine the jurisdiction of arbitrators." (*Ibid.*) " '[C]ourts presume that the parties intend courts, not arbitrators, to decide' " certain gateway questions, including " 'disputes about "arbitrability," . . . such as "whether the parties are bound by a given arbitration clause," or "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." ' [Citations.]" (*Aanderud*, *supra*, 13 Cal.App.5th at p. 891; accord *Lamps Plus*, *supra*, 587 U.S. ___, ___ [139 S.Ct. at pp. 1416-1417].) The question turns on "which issues logically or necessarily must be resolved at the gateway, or threshold, before a case can feasibly go to an arbitrator. One such logical condition precedent is whether, in fact, the parties agreed to arbitrate at all; it makes no sense to compel parties to go before an arbitrator without first determining they agreed to do so." (*Sandquist*, *supra*, 1 Cal.5th at p. 254.) "However, 'parties can agree to arbitrate "gateway" questions of "arbitrability . . . ." ' [Citation.]" (*Aanderud*, at p. 891, citing *Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 68-69 (*Rent-A-Center*).)

17

"It has long been settled that when parties have agreed to arbitration, challenges to the validity of the underlying contract, including contract defenses such as fraud in the inducement or illegality, are for the arbitrator to decide. [Citations.] This is because the arbitration clause is viewed as separate from the underlying contract. [Citation.] Thus, allegations that the main contract is unlawful or unconscionable does [*sic*] not affect the enforceability of the arbitration clause. [Citation.]" (*Nielsen Contracting, Inc. v. Applied Underwriters, Inc*. (2018) 22 Cal.App.5th 1096, 1107-1108 (*Nielsen*).)

"However, challenges to the validity of the arbitration clause itself are generally resolved by the court in the first instance. [Citations.] An exception to this rule applies when the parties have clearly and unmistakably agreed to delegate questions regarding the validity of the arbitration clause to the arbitrator. [Citations.] Such delegation clauses are generally enforceable according to their terms." (*Nielsen*, *supra*, 22 Cal.App.5th at p. 1108, citing *Rent-A-Center, supra*, 561 U.S. at pp. 68-69, 71 and other authority.)

" 'Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, . . . so the question "who has the primary power to decide arbitrability" turns upon what the parties agreed about *that* matter.' [Citations.] 'Although threshold questions of arbitrability are ordinarily for courts to decide in the first instance under the FAA [citation], the "[p]arties to an arbitration agreement may agree to delegate to the arbitrator, instead of a court, questions regarding the enforceability of the agreement." ' (*Pinela v. Neiman Marcus Group, Inc.* (2015) 238 Cal.App.4th 227, 239 . . . (*Pinela*).) The examination of who has the primary power to determine arbitrability is conducted, at least initially, through the prism of state law. [Citation.]" (*Aanderud*, *supra*, 13 Cal.App.5th at pp. 891-892.)

18

## 2. *Rent-A-Center*

Citing *Rent-A-Center, supra,* 561 U.S. at page 70, Employers argue that since Mendoza is challenging the Arbitration Policy as a whole, as opposed to the enforceability of the delegation clause, "the validity and enforceability [of the Arbitration Policy] is an issue for the arbitrator, not the Court."

In *Rent-A-Center*, an employee who had signed an arbitration agreement in an employment contract sued his former employer for employment discrimination. The United States Supreme Court recognized that in cases involving the FAA, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. [Citations.]" (*Rent-A-Center, supra,* 561 U.S. at p. 69.) The court explained that this "merely reflects the principle that arbitration is a matter of contract. [Citation.] An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." (*Id.* at pp. 69-70.) "Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate. '[A]s a matter of substantive federal law, an arbitration provision is severable from the remainder of the contract.' " (*Rent-A-Center*, at pp. 68-71.)

The court stated, "But that agreements to arbitrate are severable does not mean that they are unassailable. If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." (*Rent-A-Center*, *supra*, 561 U.S. at p. 71.) The court observed that the provision that the employer in *Rent-A-Center* sought to enforce was a delegation clause and explained that unless the employee challenged the delegation clause specifically, the court must treat the delegation clause as valid under the FAA and enforce it, leaving the employee's unconscionability challenge to the validity of

19

the arbitration agreement as a whole for the arbitrator. (*Id.* at p. 72.) Since the employee had challenged only the validity of the arbitration agreement as a whole and not the validity of the delegation clause in the courts below, the Supreme Court concluded that the employer's argument regarding the delegation clause was uncontested. (*Ibid.*) The court therefore held that the district court did not err in ordering that the employee's claim that the arbitration agreement was unconscionable, as well as the merits of the employment discrimination claim, were to be heard by the arbitrator. (*Id.* at pp. 66-67, 76.)

*Rent-A-Center* addressed the question of who rules on a challenge to the enforceability of a delegation clause: the court or the arbitrator? "The high court began this analysis by confirming that a delegation clause—nested within the larger arbitration agreement—must be viewed as an independent ('severable') contract." (*Nielsen*, *supra*, 22 Cal.App.5th at p. 1108, citing *Rent-A-Center*, *supra*, 561 U.S. at pp. 67-76.) An "argument that the arbitration agreement or the underlying contract is unenforceable is not sufficient to trigger the court's obligation to resolve contentions regarding the enforceability of a severable delegation clause." (*Nielsen*, at p. 1108, citing *Rent-A-Center,* at pp. 71-76.) Since the employee in *Rent-A-Center* challenged only the validity of the arbitration contract and never "even mention[ed] the delegation provision," the United States Supreme Court found that the arbitrator, and not the court, was to consider the enforceability of the delegation clause. "The court reasoned that the delegation clause must be viewed as a separate agreement nested within the arbitration agreement, and unless the clause is directly challenged, the arbitrator must resolve all of the disputed issues." (*Nielsen,* at p. 1109, citing *Rent-A-Center*, at pp. 65-66, 72-76.)[7]

---

[7] The California Supreme Court has not yet decided whether it will apply *Rent-A-Center* to challenges to the validity of an arbitration provision made under the CAA when the entire underlying contract is an agreement to arbitrate—which is what we have here—as opposed to an arbitration clause in some other type of contract (i.e., an employment or consumer contract). (*Sonic-Calabasas A, Inc. v. Moreno* (2011) 51

### 3. *Forfeiture*

Employers' delegation clause argument is essentially that since the Arbitration Policy contains a delegation clause that delegates multiple issues, including "formation of the arbitration policy," to the arbitrator, the contract formation issue at the heart of this appeal is for the arbitrator to decide. This prompted us to ask: what was the effect of fully litigating the contract formation question in the trial court? In our request for supplemental briefing, we asked the parties: "Does the fact that appellants . . . argued the merits of the contract formation issue (whether the parties had entered into an agreement to arbitrate) in the trial court constitute a waiver or a forfeiture and therefore preclude them from arguing on appeal that the contract formation question was reserved for the arbitrator under the delegation clause in the Arbitration Policy?"

Mendoza states that he "does not contend that [Employers] waived their delegation argument" by arguing the "merits of the contract formation issue in the trial court." He argues instead that they forfeited their delegation argument by failing to preserve it in the trial court since they never specifically argued, as they now do on appeal, that the trial court lacked jurisdiction to rule on the contract formation issue. Mendoza argues that the main thrust of the delegation argument below was that it was for the arbitrator to decide whether the class action waiver was enforceable, and that Employers "belatedly" raised that issue in their reply.

---

Cal.4th 659, 688, fn. 12 (*Sonic I*), overruled on another ground in *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109 (*Sonic II*); *Sonic I*, at p. 688, fn. 12 [since the employer did not argue that the arbitration agreement delegated responsibility to decide whether the agreement was unconscionable or violated public policy to the arbitrator, there was "no need to decide" whether *Rent-A-Center* applies to actions in state court or whether the California Supreme Court would adopt a similar rule as a matter of state law]; Knight, et al., Cal. Practice Guide: Alternative Dispute Resolution (2020 Rutter Group) ¶ 5:150.4, p. 5-160 (Knight); see also *Chin v. Advanced Fresh Concepts Franchise Corp.* (2011) 194 Cal.App.4th 704, 709.)

Employers contend that they have not waived the delegation clause issue because they were required under section 1281.2 to prove the existence of an agreement to arbitrate to obtain an order compelling arbitration, that they raised the issue below, and that it is up to an arbitrator to "determine enforcement pursuant to the Delegation Clause." They also argue that this court has the discretion to excuse any forfeiture. In light of the parties' responses, we shall consider both whether the delegation clause issue was properly preserved for appeal and whether it has been waived by arguing the merits of the contract formation issue in the trial court.

In both of their motions to compel, Employers raised the delegation clause issue for the first time in their *reply* papers under the heading "Whether the Class Action Waiver is Enforceable or Not is a Decision for the Arbitrator." In both replies, citing *Rent-A-Center*, they argued that since Mendoza challenged the Arbitration Policy "in its entirety versus the enforceability of the delegation clause, the arbitrator will determine whether the agreement to arbitrate is enforceable." Employers did not cite or discuss any other cases on delegation clauses or develop this point further. In the next paragraph, they argued that the questions whether the class action waiver violated public policy and was unenforceable was for the arbitrator to decide on grounds unrelated to the delegation clause.[8]

Employers argue that "[t]here is no evidence in the record supporting, or even suggesting, a finding that the delegation provision was fraudulent, obtained under duress, or is unconscionable." But since Employers reserved this issue for their reply briefs below, Mendoza did not have an opportunity to brief the delegation clause or present

---

[8] On appeal, Employers complain that although they raised the delegation clause issue below, the trial court failed to address it. In fact, the trial court's orders did not expressly address the effect of the delegation clause. But since Employers' discussion of the delegation clause was raised in a cursory fashion and buried at the end of their reply papers under a heading about the class action waiver, we cannot fault the trial court for failing to address the issue.

evidence attacking the delegation clause in the trial court. Since the delegation issue is potentially dispositive, we question why, after being given the opportunity to renew their motion, Employers did not raise the delegation clause as a threshold issue in their opening points and authorities in support of their second motion to compel. And we are troubled by the fact that Mendoza was not given an opportunity to brief this question or present evidence relating to any contract defenses to the delegation clause in the trial court.

"Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider. [Citation.] In our adversarial system, each party has the obligation to raise any issue or infirmity that might subject the ensuing judgment to attack." (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168.)

Notably, the employer in *Rent-A-Center*, who sought to compel arbitration, raised the delegation clause in its motion to compel in the district court, as well as its reply. The employee did not address the delegation clause in his opposition and focused his arguments on the arbitration agreement as a whole. The employee also failed to address this issue in the court of appeals. The high court concluded that since the employee had not challenged the delegation clause below, it must treat the delegation as valid, "leaving any challenge to the validity of the [arbitration agreement] as a whole for the arbitrator." (*Rent-A-Center*, *supra*, 561 U.S. at pp. 65, 72-73.) Similarly, the employers in *Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771 (*Ajamian*) and *Tiri* raised the delegation clause in their motions to compel. But unlike the plaintiff in *Rent-A-Center*, the plaintiffs in those cases challenged the delegation clause as unconscionable in their opposition in the trial court. Thus, the issue was squarely before the appellate courts, which addressed the validity of the delegation clauses on the merits. (*Ajamian*, *supra*, at pp. 780, 794; *Tiri*, *supra*, 226 Cal.App.4th at pp. 238, 245.)

23

Unlike the parties who moved to compel arbitration in *Rent-A-Center*, *Ajamian*, and *Tiri*, Employers did not raise the delegation clause in their moving papers. As noted, they first raised it in their reply papers in a cursory manner buried under an argument heading about the class action waiver. Their argument consisted of a short paragraph that cites *Rent-A-Center*. The point is otherwise undeveloped and could easily be overlooked or considered part of their argument on the class action waiver. On this record, the trial court may have impliedly found that Employers forfeited any argument regarding the delegation clause by failing to adequately brief it in their motions. Moreover, we conclude that Employers' briefing in the trial court was insufficient to preserve the issue for appeal.

Additionally, the right to arbitrate may be waived by " 'conduct so inconsistent with the exercise of the right to arbitration as to constitute an abandonment of that right.' " (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1201 (*St. Agnes*).) Submitting an issue to a judicial forum for resolution of arbitrable issues, coupled with failure to request arbitration, has been found to constitute waiver of the right to arbitrate. (*Pulli v. Pony Internat., LLC* (2012) 206 Cal.App.4th 1507, 1511, 1521 (*Pulli*).) Since the delegation clause is a separate agreement to arbitrate from the Arbitration Policy, the question becomes whether Employers have forfeited any right to arbitrate the contract formation issues they contend were delegated to the arbitrator by fully litigating them in the trial court and, by extension, in this appeal.

Under California law, "judicial litigation of the merits of arbitrable issues . . . waives a party's right to arbitration." (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 188 (*Doers*), italics omitted.) Such an "approach . . . is similar to that taken by the federal courts"; under federal law, waiver is found where a party has been prejudiced by the litigation of arbitrable issues. (*Ibid.*; see also *St. Agnes*, *supra*, 31 Cal.4th at p. 1203 [citing *Doers* favorably on this point]; *Pulli*, *supra*, 206 Cal.App.4th at pp. 1511, 1521 [the party requesting arbitration may not submit the question of the

24

legality of the arbitration provision under Labor Code section 206.5 to the court on the merits without waiving the right to have the arbitrator decide the issue]; *In re Check Account Overdraft Litigation* (11th Cir. 2012) 685 F.3d 1269, 1274-1275 [party waives right to arbitrate the threshold issue of unconscionability by submitting that question to the court].)

In *St. Agnes*, that Supreme Court agreed that the six factors described in *Sobremonte v. Superior Court* (1996) 61 Cal.App.4th 980, 992 were "relevant and properly considered in assessing waiver claims." (*St. Agnes*, *supra*, 31 Cal.4th at p. 1196.) Two of those factors are relevant here: (1) whether Employers' actions are inconsistent with the right to arbitrate, and (2) whether the delay affected, misled, or prejudiced Mendoza. (*Ibid.*) Mere participation in ligation is not prejudicial where there has been no judicial litigation of the merits of arbitrable issues. (*Id.* at p. 1203.) But here, Employers have already fully litigated the very issue that they now argue was delegated to the arbitrator, namely whether the parties have entered into an agreement to arbitrate. Even in their second motion to compel, having been placed on notice by the trial court that the issue of contract formation was of concern, they made no mention of the delegation clause in their moving papers, mentioning it only in connection with the class action waiver. Their litigation of that question in the trial court and in this court is inconsistent with the claim that the contract formation issue was for the arbitrator to decide and prejudicial to Mendoza since he has already litigated that question in the trial court and here.

In summary, we conclude that Employers forfeited any right to have the arbitrator decide whether the parties have entered into a contract to arbitrate Mendoza's underlying claims by failing to properly preserve those claims in the trial court. They also waived that right by fully litigating the question there and here.

25

#### *4. Alternately, considering the delegation clause issue on the merits, it was for the trial court to decide the contract formation question.*

Even if we were to consider Employers' delegation clause argument on the merits, we would hold that it was for a court to decide the threshold question whether the parties had entered into an agreement to arbitrate.

Since the trial court decided the issues related to the formation of an agreement to arbitrate, and Employers did not request a statement of decision, we may presume the trial court impliedly found the delegation clause did not limit its jurisdiction to decide the issue. Accordingly, we must determine whether the trial court erred in making that implied finding. (*Aanderud*, *supra*, 13 Cal.App.5th at p. 891; see also *Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970-971 [where parties fail to request a statement of decision on motion to compel arbitration, appellate court will infer all necessary findings for which substantial evidence exists in the record].)

"[P]arties may agree to have an arbitrator decide not only the merits of a particular dispute but also ' "gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.' " (*Henry Schein, Inc. v. Archer & White Sales, Inc.* (2019) 586 U.S. ___ [139 S.Ct. 524, 529].) But "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." (*First Options*, *supra*, 514 U.S. at p. 944.)

This is a "heightened standard" that "pertains to the parties' manifestation of intent, not the agreement's validity." (*Najarro v. Superior Court* (2021) 70 Cal.App.5th 871, 879-880 (*Najarro*), citing *Rent-A-Center, supra*, 561 U.S. at p. 69, fn. 1.) That is because the question of who would decide gateway questions like the unconscionability of an arbitration provision "is not one that the parties would likely focus upon in contracting, and the default expectancy is that the court would decide the matter." (*Ajamian*, *supra*, 203 Cal.App.4th at p. 782, citing *First Options*, *supra*, 514 U.S. at pp.

26

943-945 [the issue of who should decide arbitrability "is rather arcane"].) "Although parties are free to authorize arbitrators to resolve such questions, [courts] will not conclude that they have done so based on 'silence or ambiguity' in their agreement, because 'doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.' " (*Lamps Plus*, *supra*, 587 U.S. at p. ___ [139 S.Ct. at p. 1417].) The "clear and unmistakable" test applies under both the FAA and California law. (*Ajamian*, at pp. 781-782, fn. 5.)

Courts have held that" '[t]here are two prerequisites for a delegation clause to be effective. First, the language of the clause must be clear and unmistakable. [Citation.] Second, the delegation must not be revocable under state contract defenses such as fraud, duress, or unconscionability.' " (*Aanderud*, *supra*, 13 Cal.App.5th at p. 891.)

The first sentence of the delegation clause in the Arbitration Policy provides: "The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or *formation of the arbitration policy*, including without limitation any claim that this policy is void or voidable." (Italics added.) Employers argue that the phrase "exclusive authority to resolve any dispute" in the delegation clause is a " 'clear and unmistakable' delegation of jurisdiction to the arbitrator." Mendoza does not address this point.

The language of the delegation clause here is almost identical to that of the delegation clause in *Rent-A-Center*, *supra*, 561 U.S. 63, 66. In *Rent-A-Center*, *the parties* agreed that the clear and unmistakable test applied and that the delegation clause provided clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. (*Id*. at p. 69, fn. 1.) The district court had found the language of the delegation clause clear and unmistakable, and the employee did not dispute that point before the Ninth Circuit. (*Id.* at pp. 66, 69, fn. 1.) But in the Supreme Court, the employee argued that the delegation was not clear and unmistakable because of the unconscionability claims he raised. The court rejected that point and explained that the clear and unmistakable

27

requirement pertains to the parties' manifestation of intent to arbitrate gateway issues, not the agreement's validity. (*Ibid.*) Since the employee did not challenge the parties' manifestation of intent, the Supreme Court did not rule on the question whether the language of the delegation clause—which is almost identical to the clause here—was clear and unmistakable. (*Id.* at p. 69, fn. 1; *Ajamian*, *supra*, 203 Cal.App.4th at p. 784.)

We agree with Employers that California cases that have reviewed delegation clauses that are similar to the clause here have held that the language at issue is clear and unmistakable. (See e.g., *Tiri*, *supra*, 226 Cal.App.4th at pp. 237, 242 ["[t]his language indicates an intent to delegate all issues to an arbitrator, including issues of enforceability" and the plaintiff conceded as much]; *Najarro*, *supra*, 70 Cal.App.5th at pp. 877, 878, 888.)

The second requirement for a delegation clause to be effective is that it cannot "be revocable under state contract defenses such as fraud, duress, or unconscionability.' [Citations.]" (*Aanderud*, *supra*, 13 Cal.App.5th at p. 891; *Sonic II*, *supra*, 57 Cal.4th at pp. 1142-1143.) Without any citation to legal authority or discussion of the case law on point, Employers baldly assert that "[t]here is no evidence in the record supporting, or even suggesting a finding that the delegation provision was fraudulent, obtained under duress, or is unconscionable. The delegation provision is valid and effective." But Mendoza responds that gateway questions regarding the formation of the arbitration agreement or fraud in the execution of the arbitration agreement are not subject to arbitration and are for a court to decide under *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394 (*Rosenthal*).

We agree with Mendoza that despite the existence of a broadly worded delegation clause such as that before us, courts have held that certain gateway issues are for a court to decide, including whether the parties entered into an agreement to arbitrate at all. Thus, in *Najarro*, *supra*, 70 Cal.App.5th 871, the appellate court concluded that a court must determine whether the parties formed an arbitration agreement despite existing

28

delegation clauses. The appellate court interpreted two separate versions of an arbitration agreement between eight individuals and their employers, which it labelled "Version One" and "Version Two." The delegation clauses, similar to the clause before us, provided that except "with respect to group, collective, or representative actions, the arbitrator shall have the exclusive power to resolve any dispute relating to the interpretation, applicability, enforceability, or *formation of* this [a]greement, including but not limited to the assumption that any section of this [a]greement is unenforceable, . . . ." (*Id.* at pp. 877, 878, italics added.) The court held that there was no clear and unmistakable delegation to the arbitrator to decide enforceability in Version One of the arbitration agreement since the severability clause in that agreement allowed a court to determine issues such as enforceability and unconscionability. (*Id.* at p. 880.) Since the severability clause in Version Two of the arbitration agreement did not contain comparable language allowing a court to sever unenforceable or unconscionable provisions, the appellate court concluded that Version Two of the arbitration agreement clearly and unmistakably delegated issues of arbitrability to the arbitrator. (*Id.* at p. 888.) Since the delegation was clear and unmistakable and the employees who signed Version Two of the agreement had not specifically challenged the delegation clause, the court stated that it "may only determine whether Version Two was entered into." (*Id.* at p. 889.)

The court held that the employees "who signed Version Two must have their enforcement challenges determined by the arbitrator unless they can show that they never entered into any agreement at all." (*Najarro*, *supra*, 70 Cal.App.5th at p. 889.) Quoting *Rent-A-Center*, the court explained that "[d]espite the existence of a clear and unmistakable delegation clause, a court remains able to determine 'whether any agreement between the parties "was ever concluded." ' " (*Ibid.*, quoting *Rent-A-Center,* at p. 70, fn. 2.) The court held that two of the employees had demonstrated that Version Two of the arbitration agreement was unenforceable, despite the presence of a valid

29

delegation clause, due to fraud in the execution of their agreements. (*Najarro*, at pp. 889, 891.) The court explained that "claims of fraud in the execution are not arbitrable, because when fraud in the execution is involved, 'the parties have not agreed to arbitrate any controversy.'" (*Id.* at p. 889, citing *Rosenthal*, *supra*, 14 Cal.4th at p. 416.) Thus, even though the delegation clauses had express language delegating questions regarding the "formation" of the arbitration agreement to the arbitrator, the question whether the parties had agreed to arbitrate anything was for a court to decide.

Similarly, in *Bruni v. Didion* (2008) 160 Cal.App.4th 1272 (*Bruni*), which considered the application of a delegation clause in an arbitration provision to a claim involving contract formation and the existence of an agreement to arbitrate, the court held that despite the delegation, *a court* must consider "a claim that the party resisting arbitration never actually agreed to be bound." (*Id.* at pp. 1279-1282, 1284.) "'Where . . . a party's apparent assent to a written contract is *negated* . . . , there is simply no arbitration agreement to be enforced.'" (*Ibid.*, quoting *Rosenthal*, *supra*, 14 Cal.4th at p. 416.) The court concluded that if the party resisting arbitration "is claiming that it never agreed to the arbitration clause at all," then "the court must consider that claim. On the other hand, if it is not denying that it agreed to the arbitration clause, but instead it is claiming some other defense to enforcement of the arbitration clause—e.g., illegality or fraud in the inducement—then the court must enforce the 'arbitrability' portion of the arbitration clause by compelling the parties to submit that defense to arbitration." (*Bruni*, at p. 1287.)

The Ninth Circuit Court of Appeals decision in *Ahlstrom v. DHI Mortg. Co.*, *L.P.* (9th Cir. 2021) 21 F.4th 631 (*Ahlstrom*) is in accord. The *Ahlstrom* court stated that it is "well-established that some 'gateway' issues pertaining to an arbitration agreement, such as issues of validity and arbitrability, can be delegated to an arbitrator by agreement." (*Id.* at p. 634.) Such gateway matters include whether the arbitration agreement is valid (e.g., not unconscionable or illegal) or whether a concededly binding arbitration clause

applies to a certain type of controversy. (*Ibid*.; see e.g., *Pinela*, *supra*, 238 Cal.App.4th at pp. 241, 249-251 [unconscionability]; *Nielsen*, *supra*, 22 Cal.App.5th at pp. 1115-1121 [illegality].)

The plaintiff in *Ahlstrom* filed a putative class action alleging employment-related claims against his former employer. The employer moved to compel arbitration based on an arbitration agreement the employee had signed when hired, which had a delegation clause that provided that the arbitrator " 'shall have exclusive authority to resolve any dispute relating to *the formation*, enforceability, applicability, or interpretation of' " the arbitration agreement. (*Ahlstrom*, *supra*, 21 F.4th at pp. 633-634; italics added.) The employee opposed the motion on the ground that an agreement to arbitrate had never been properly formed. (*Id.* at p. 634.)

Despite the language of the delegation clause, the appellate court in *Ahlstrom* rejected the employer's contention that the parties to an arbitration agreement may delegate issues of contract formation to an arbitrator. (*Ahlstrom*, *supra*, 21 F.4th at p. 635.) The court stated, " 'Although challenges to the *validity* of a contract with an arbitration clause are to be decided by the arbitrator, challenges to the very *existence* of the contract are, in general, properly directed to the court.' . . . As the Supreme Court has recognized, a court should order arbitration only if it is convinced an agreement has been formed." (*Ibid.*, citing *Granite Rock Co. v. Int'l Bhd. Of Teamsters* (2010) 561 U.S 287, 299-300, and *First Options*, *supra*, 514 U.S. at p. 943.) In addition, the court noted that the Fifth and Tenth circuits had also rejected this argument. (*Ahlstrom*, at p. 635, citing *Edwards v. Doordash, Inc*. (5th Cir. 2018) 888 F.3d 738, 744 [arguments that an agreement to arbitrate was never formed are to be heard by the court even where a delegation clause exists]; *Fedor v. United Healthcare, Inc*. (10th Cir. 2020) 976 F.3d 1100, 1104 ["Courts must . . . first determine whether an arbitration agreement was indeed formed before enforcing a delegation clause therein"].)

31

These cases are consistent with the Supreme Court's analysis in *Rent-A-Center*. Given Mendoza's assertion that the parties did not enter into an arbitration agreement at all, Employers' reliance on *Rent-A-Center* is unavailing. The court specifically excluded the application of its decision to the threshold issue of whether an arbitration agreement exists. "The issue of the agreement's 'validity' is different from the issue of whether any agreement between the parties 'was ever concluded,' and . . . we address only the former." (*Rent-A-Center*, *supra* 561 U.S. at p. 70, fn. 2.)

Based on these authorities, we conclude that although the delegation clause provides that the arbitrator "shall have exclusive authority to resolve any dispute relating to . . . *formation of the arbitration policy*," as a matter of law, the question whether the parties entered into an agreement to arbitrate anything at all is for a court to decide. Since Mendoza challenged contract formation and the very existence of an agreement to arbitrate, the trial court did not err when it addressed those issues. We turn now to the question whether the trial court erred when it found that the parties had not entered into an agreement to arbitrate.

### E. Whether the Parties Entered into a Binding Agreement to Arbitrate

The strong public policy favoring contractual arbitration does not extend to parties who have not agreed to arbitrate. (*Esparza v. Sand & Sea, Inc*. (2016) 2 Cal.App.5th 781, 787 (*Esparza*).) As the California Supreme Court explained in *Pinnacle*, in "California, '[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate.' (*Craig v. Brown & Root, Inc*. (2000) 84 Cal.App.4th 416, 420 . . . [(*Craig*)]; [citation].) Generally, an arbitration agreement must be memorialized in writing. [Citation.] A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement. A signed agreement is not necessary, however, and a party's acceptance may be implied in fact (e.g., *Craig*, at p. 420 [employee's continued employment constitutes acceptance of an arbitration

agreement proposed by the employer]) or be effectuated by delegated consent ([citation].) An arbitration clause within a contract may be binding on a party even if the party never actually read the clause. (*24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1215 . . . [(*24 Hour Fitness*)].)" (*Pinnacle, supra,* 55 Cal.4th at pp. 234-236.)

An essential element of any contract is the consent of the parties, or mutual assent, which must be communicated by each party to the other. (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270; Civ. Code, § 1565, subd. 3.) " 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.' " (*Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 173.)

The party seeking arbitration bears the burden of proving the existence of an arbitration agreement by the preponderance of the evidence. (*Pinnacle*, *supra*, 55 Cal.4th at p. 236.) In ruling on a petition to compel arbitration, "the court must determine whether the parties entered into an enforceable agreement to arbitrate that reaches the dispute in question, construing the agreement to the limited extent necessary to make this determination. [Citation.] If such an agreement exists, the court must order the parties to arbitration unless arbitration has been waived or grounds exist to revoke the agreement." (*California Correctional Peace Officers Assn. v. State of California* (2006) 142 Cal.App.4th 198, 204-205.)

### 1. *The parties did not enter into an express agreement to arbitrate*

Several California courts have considered whether the language of an arbitration provision in an employee handbook, on its own or when combined with other documents, creates a binding agreement to arbitrate employment-related claims. We shall summarize six cases and then analyze the Handbook, checklists, and acknowledgment forms at issue in this case.

### a. Cases Addressing Whether Employee Handbook Contains an Agreement to Arbitrate

The employer in *Romo v. Y-3 Holdings* (2001) 87 Cal.App.4th 1153 (*Romo*) moved to compel arbitration based on an arbitration agreement in a 44-page employee handbook. Section VIII of the handbook contained a three-page arbitration agreement that included signature lines for both the employer and the employee, which neither party had signed. Section IX of the handbook contained an acknowledgement form that the employee did sign, in which she acknowledged receipt of the handbook, agreed to abide by the policies and rules in the handbook, and acknowledged that the employer could change its policies and rules at any time. (*Id.* at pp. 1156-1157.) The appellate court concluded that there were two separate agreements in the handbook: (1) an arbitration agreement that the parties had not signed and (2) an agreement to be bound by the employer's rules, policies, and procedures. (*Id.* at p. 1159.) The court concluded that the arbitration agreement was intended to be a complete, stand-alone agreement that contemplated signatures from both parties that were separate from the signature on the acknowledgment form and held that since the parties had not assented to the arbitration agreement, they had not agreed to arbitrate. (*Id.* at pp. 1159-1160.)

The employer in *Mitri v. Arnel Management Co*. (2007) 157 Cal.App.4th 1164 (*Mitri*) moved to compel arbitration based on a two-page "Arbitration Agreement" in its employee handbook and acknowledgement forms that the two employee plaintiffs had signed. While the handbook generally stated a company policy that disputes arising out of the employment would be settled by binding arbitration and "described some of the parameters of such an arbitration," the arbitration clause stated that " '[a]s a condition of employment, all employees are required to sign an arbitration agreement' " and that employees would be provided with "a copy of their signed arbitration agreement." (*Id.* at pp. 1170-1171.) The court concluded that the latter provisions demonstrated an intent to have employees sign a separate arbitration agreement. (*Ibid.*) Since there was no

evidence that either employee had signed such an agreement, the court held that there was no agreement to arbitrate. (*Id.* at p. 1171.) The court also rejected the argument that the employees had agreed to arbitration when they signed the acknowledgement forms, which described the handbook as "an excellent resource for employees" "designed to acquaint them with" company policies, but did not refer to "an *agreement* by the employee to abide by the handbook's" arbitration provision. (*Id.* at p. 1173.)

When the employer in *Ajamian* first hired the employee for an at-will position, it gave her the company's policies and procedures manual, which included an employee handbook, which had an arbitration clause. Although the arbitration clause had a signature line for the employee to sign, she did not sign it. The employer also gave her an acknowledgement form that confirmed receipt of the *handbook* and stated that employment claims were subject to arbitration. The employee did not sign the acknowledgment form, either. However, she did sign a form acknowledging receipt of the *policies and procedures manual.* (*Ajamian*, *supra*, 203 Cal.App.4th at pp. 775-776.) Months later, the employer promoted the employee to a position for which she had an employment contract that had an arbitration clause. Six weeks before she left the job, the employer terminated the employment contract, and the employee was once again an at-will employee. (*Id.* at pp. 776-779.) After the employee sued for employment-related claims, the employer moved to compel arbitration based on the arbitration clauses in both the handbook and the employment contract. (*Id.* at pp. 779-780.)

The court in *Ajamian* held that the arbitration agreement in the employment contract was unconscionable. (*Ajamian*, *supra*, 203 Cal.App.4th at pp. 795-804.) The court rejected the employer's contention that the parties had entered into an agreement to arbitrate based on the arbitration clause in the handbook and a clause in the employment contract, which provided that upon termination of the employment contract, the "employment would be 'governed' by [the employer's] 'policies then in effect.' " (*Id.* at p. 805.) The court reasoned that the latter provision did "not specifically state she would

35

be bound by any arbitration agreement or even mention arbitration," there was no evidence that the employer provided the employee with the policies that were in effect when it terminated her employment contract, and the employee never signed or agreed to the arbitration agreement in the handbook. (*Ibid.*)

The employer in *Sparks v. Vista Del Mar Child & Family Services* (2012) 207 Cal.App.4th 1511 (*Sparks*), abrogated on another ground as stated in *Harris*, *supra*, 248 Cal.App.4th at pp. 385-390, sought to compel arbitration based on an arbitration provision in two employee handbooks from 2006 and 2009 and an acknowledgement form the employee signed in 2006. The 2006 handbook stated that it was a general summary designed to acquaint employees with information about the employer and that it did not create a contract of employment. (*Id.* at p. 1516.) Both handbooks had an arbitration clause, but there were no signature lines for the arbitration clause in either handbook. In 2006, the employee signed a form acknowledging receipt of the 2006 handbook, which stated that the handbook contained information about general company policies and the employer may rescind, change, or add policies at its sole discretion. In 2009, the employee received a new handbook that contained an arbitration clause that provided that employees would have "to sign for receipt of the handbook acknowledging inclusion of the arbitration policy" and "will be required to sign a full arbitration agreement" that would also be signed by the employer. The employee did not sign a form acknowledging receipt of the handbook or a separate arbitration agreement in 2009. (*Id.* at pp. 1516-1517.)

The *Sparks* court found that these documents did not create an agreement to arbitrate since the arbitration clause in the handbook was not prominently distinguished from the other clauses, was not specifically highlighted, and there was no place for the employee to acknowledge it in writing. (*Sparks*, *supra*, 207 Cal.App.4th at p. 1519.) In addition, the acknowledgment form "did not reference the arbitration clause much less advise [the employee] that he would be bound by it." (*Id.* at p. 1522.) Because the

36

language in the handbook suggested it "was informational rather than contractual" and the employer failed to call attention to the arbitration clause in the acknowledgment form, the court found there was no agreement to arbitrate. (*Id.* at p. 1520.)

The employer in *Harris* moved to compel arbitration based on four documents: (1) an employee handbook, (2) an alternative dispute resolution agreement attached to the handbook as Appendix A, (3) a separate "current employment alternative dispute resolution policy" (which the court labelled the "arbitration agreement"), and (4) an acknowledgement form. (*Harris*, *supra*, 248 Cal.App.4th at p. 377.) "Page 9 of the handbook was entitled, 'MANDATORY ALTERNATIVE DISPUTE RESOLUTION BINDING ARBITRATION OF CLAIMS.' " It advised the employee that the employer had adopted mandatory binding arbitration as a means of dispute resolution and stated: " 'Confirmation of receipt and agreement to this policy is an absolute prerequisite to your hiring by, and continued employment with, the Company.' " (*Id.* at pp. 377-378.) Page 9 summarized the arbitration policy and ended with: "For a complete summary of the Company's policy on mandatory binding arbitration, please see Appendix A to this Handbook, as well as the Agreement to Arbitrate, a copy of which you will be required to execute prior to employment with the Company. [¶] If, for any reason, an applicant fails to execute the Agreement to Arbitrate yet begins employment, that employee will be deemed to have consented to the Agreement to Arbitrate by virtue of receipt of this Handbook." Appendix A contained a more comprehensive arbitration agreement. The introduction to Appendix A stated that "the Company hereby offers and adopts the following terms and conditions for Employee's continued employment." (*Id.* at p. 378.) The arbitration agreement provided in part: " 'If Employee voluntarily continues his/her employment, . . . Employee will be deemed to have knowingly and voluntarily consented to and accepted all of the terms and conditions set forth herein without exception." (*Id.* at p. 379.) It provided that the employer could "modify and/or terminate this Policy . . . to the extent necessary or desired so to comply with any future developments or changes in

37

the law." (*Ibid.*) The employee signed an acknowledgement form expressly acknowledging receipt of the " 'Alternative Dispute Resolution Agreement" and the handbook. (*Id.* at p. 377.) The employee argued that the parties had not agreed to arbitrate because he did not sign the separate arbitration agreement described by the handbook, the arbitration provision on page 9 of the handbook, or Appendix A, and had only acknowledged receipt of documents. (*Id.* at p. 380.)

Unlike the cases discussed above, the *Harris* court concluded that the parties had agreed to arbitrate. (*Harris*, *supra*, 248 Cal.App.4th at pp. 376, 385, 390.) The court reasoned that the employee had specifically acknowledged receipt of the arbitration agreement. The court added that the handbook's table of contents referred the reader to page 9 with the subject heading of " 'BINDING ARBITRATION OF CLAIMS,' " that the obligation to arbitrate was highlighted on page 9 in bold underscored letters, that page 9 expressly mentioned Appendix A, and stated "without equivocation that receipt and agreement to the mandatory arbitration policy is 'an absolute prerequisite' to hiring and continued employment" and that " '[i]f, for any reason, an applicant fails to execute the Agreement to Arbitrate yet begins employment, that employee will be deemed to have consented to the Agreement to Arbitrate by virtue of receipt of this Handbook.' " (*Id.* at p. 383.)

The employee handbook in *Esparza*, *supra*, 2 Cal.App.5th 781 started with a " 'welcome letter,' " which stated that the handbook would give the employee " 'an overview and better understanding' " of the employer's " 'core policies,' " and that the handbook was " 'not intended to be a contract (express or implied)' " or to " 'otherwise create any legally enforceable obligations on the part of the company or its employees.' " (*Id.* at p. 784.) In the welcome letter, the employer reserved " 'the right to revise, modify, delete, or add to any and all policies, procedures, work rules, or benefits stated in this handbook or in any other document at any time (except as to its at-will employment policy) without prior notice . . . .' " (*Ibid.*) The handbook had a 2-page "Agreement to

38

Arbitrate," which—unlike the rest of the handbook—was printed in all capital letters and written in the first person. It stated, "I further agree and acknowledge that the company and I will utilize binding arbitration to resolve all disputes that may arise out of the employment context." (*Id.* at p. 784.) The last two pages of the handbook contained an acknowledgement form, which stated that the handbook was "designed to provide information to employees . . . regarding various policies, practices and procedures that apply to them including our Arbitration Agreement." The acknowledgment form provided that the employer reserved "the right to modify, alter or eliminate any and all of the policies and procedures set forth herein at any time, for any reason, with or without notice. *Neither this manual nor its contents constitute, in whole or in part, either an express or implied contract of employment . . . .*" (*Ibid.*, italics added in *Esparza.*) This form asked the employee to acknowledge receipt of the handbook, said she was expected to read it within the first week of employment, and advised her that failure to abide by its provisions may result in disciplinary action. (*Ibid.*)

The *Esparza* court held there was no express agreement to arbitrate. The court stated that the welcome letter undermined the employer's argument that the handbook created a binding agreement to arbitrate since it expressly stated that the handbook was not intended to be a contract, either express or implied, or to create any legally enforceable obligations, including the obligation to arbitrate. Given the breadth of the language in the welcome letter, the court rejected the employer's argument that it only disclaimed the creation of an employment contract. (*Esparza*, *supra*, 2 Cal.App.5th at p. 789.) The court concluded that the acknowledgement form did not create an agreement to arbitrate because (1) although it mentioned the employer's arbitration policy, it did not say that the employee agreed to abide by the arbitration provision; (2) it said the handbook was merely informational; and (3) it expressly recognized that the employee had not yet read the handbook and there was no basis to assume the employee agreed to be bound by something she had not read. (*Id.* at pp. 783, 790.)

### b. Analysis

Employers urge us to follow *Harris* and argue that Mendoza expressly agreed to arbitration when he signed the acknowledgement forms. Mendoza relies on *Esparza*, *Sparks*, and *Ajamian* and argues that the acknowledgement forms and the Handbook did not suffice to create a legally binding agreement to arbitrate.

We begin with the document checklists that Mendoza signed in 2012 and 2014, in which he (1) acknowledged receipt of the Handbook and 14 other items and (2) stated that "questions regarding these items [had] been explained to [him] to [his] satisfaction." Neither checklist mentions arbitration. The bare-bones acknowledgement of receipt of the Handbook on the checklists, in our view, was insufficient to create a binding agreement to arbitrate, and was redundant of language in the two acknowledgment of receipt forms. We, therefore, shall not consider the checklists further.

Unlike *Romo* and *Ajamian*, where the arbitration provisions in the handbook had signature lines, there are no signature lines on either the Arbitration Policy or anywhere else in the Handbook. Like the arbitration provision in *Sparks*, there was no place for Mendoza to acknowledge the arbitration provision in writing. (*Sparks*, *supra*, 207 Cal.App.4th at p. 1519.)

In finding no agreement to arbitrate, some courts relied on language in the arbitration clause or the handbook that indicated that the employee was expected to sign an arbitration agreement that was separate from the handbook. (*Romo*, *supra*, 87 Cal.App.4th at pp. 1159-1169; *Mitri*, *supra*, 157 Cal.App.4th at pp. 1170-1171; *Sparks* *supra*, 207 Cal.App.4th at pp. 1516-1517.) There is no such language in the arbitration clause here or the other documents that Employers rely on.

Some courts consider the location of the arbitration clause, its type size and style, and whether it stood out from the rest of the handbook. (See e.g., *Sparks*, *supra*, 207 Cal.App.4th at pp. 1516-1517; *Harris*, *supra*, 248 Cal.App.4th at p. 383.) Employers argue that the Arbitration Policy is not buried in the Handbook and is the first substantive

40

provision in the Handbook. In fact, it follows the welcome letter and the section on the at-will employment policy. The 30-page Handbook is divided into 15 sections that are labelled with topic headings. FTU used the same size and style of font throughout the Handbook. To add emphasis to both the text and the headings, FTU used bold face letters, underscoring, all capital letters, or a combination of those techniques. Unlike the handbook in *Harris*, there was no table of contents in the Handbook that drew the reader's attention to the Arbitration Policy.

Page 1 of the Handbook contains the welcome letter. Page 2 of the Handbook begins with the statement: "**THE POLICIES BELOW ARE A CONDITON OF EMPLOYMENT WITH THE COMPANY**" in all capital letters, bold, and unscored. The first five sections of the Handbook are set off by headings that are in the same font style and size as the text, except that the headings are bold and centered. FTU used this style of heading for the "**At-Will Employment Policy,**" the "**Binding Arbitration Policy**" (emphasis original) and three other sections. Starting on page 7, the Handbook used other heading styles with some headings in bold, all capital letters that are underscored (i.e., "**SAFETY POLICY**") and others in bold, all capital letters (i.e., "**NON-DISCRIMINATION EMPLOYER**," "**COMPANY RULES AND REGULATIONS,**" and "**BENEFITS PROVIDED BY THE COMPANY**"). This suggests FTU thought the latter policies were more important than the ones that preceded them, including the Arbitration Policy. The Arbitration Policy was not prominently distinguished from the other clauses in the Handbook, was not specifically highlighted, did not stand out from other sections in the Handbook visually or in its use of language, and there was no place in the Handbook for the employee to sign or acknowledge the Arbitration Policy in writing.

Courts that found no agreement to arbitrate relied on language in the handbook or acknowledgement forms that indicated that the handbook was intended to be informational, not contractual; could be changed by the employer at any time; or did not

41

create a contract of employment. (See e.g., *Esparza*, *supra*, 2 Cal.App.5th at pp. 784-785 [handbook and acknowledgement form said handbook was informational and could be changed by employer; handbook said it was not intended to create any kind of contract or enforceable legal obligation]; *Sparks*, *supra*, 207 Cal.App.4th at pp. 1516, 1520 [handbook said it was informational and did not create a contract of employment; acknowledgment form said handbook was informational and employer could change it at any time]; see also *Mitri*, *supra*, 157 Cal.App.4th at p. 1173; *Romo*, *supra*, 87 Cal.App.4th at pp. 1156-1157.)

All three of these factors are present in this case. First, the welcome letter stated that the Handbook was "designed for quick reference and general information" and provided "an overview" of FTU's procedures, practices, and policies. This concept was repeated in the Second Acknowledgment, which stated that the Handbook was "designed for quick reference and that it sets forth many but not all of" Employers' "policies and guidelines" and that "the policies and procedures described in this handbook are for purposes of information only."

Second, the welcome letter stated that the policies summarized in the Handbook, except the at-will employment policy, "are subject to changes and/or deletions from time to time" and that "all terms and conditions of your employment may be changed or withdrawn at [the] company's unrestricted option at any time, with or without good cause." The Handbook repeated this notion on page 2 under the heading "At-Will Employment Policy." The Second Acknowledgement repeated this point as well, stating that except for the at-will policy, the policies it the Handbook may be amended or modified by the employer at any time.

Third, the welcome letter stated that it was "not intended as a contract of employment." The Second Acknowledgement repeated this point, requiring Mendoza to acknowledge that the Handbook and the policies contained therein "are not in any way intended as a contract of employment." This language taken together indicates that the

42

Handbook and acknowledgement forms were intended to be informational, not contractual. Moreover, FTU referred to the arbitration clause that it now seeks to enforce as a "policy," rather than a "contract" or "agreement" to arbitrate. These factors all weigh against finding an agreement to arbitrate.

Another factor courts consider in determining whether the parties have agreed to arbitrate is whether the acknowledgment form mentions arbitration. The *Mitri* court rejected the employer's argument that the employee's signature on an acknowledgement form created an agreement to arbitrate, noting that "[c]onspicuously absent" from the acknowledgment form was any reference to an "*agreement* to abide by the handbook's arbitration provision." (*Mitri*, *supra*, 157 Cal.App.4th at p. 1173.) In *Ajamian*, a contract provision that the employee would be bound by the employer's policies "then in effect" did not create an agreement to arbitrate because it did not "specifically state she would be bound by any arbitration agreement or even mention arbitration at all." (*Ajamian*, *supra*, 203 Cal.App.4th at p. 805.) Although the acknowledgment form in *Esparza* mentioned arbitration as an employer policy, it did not create an agreement to arbitrate because it did not say the employee agreed to abide by the arbitration provision and expressly recognized that she had not yet read the handbook. (*Esparza*, *supra*, 2 Cal.App.5th at pp. 783, 790.) Conversely, in the acknowledgement form in *Harris*—where the court found an agreement to arbitrate—the employee expressly acknowledged receipt of the employer's "Alternative Dispute Resolution Agreement." (*Harris*, *supra*, 248 Cal.App.4th at p. 377; see also *24 Hour Fitness*, *supra*, 66 Cal.App.4th at p. 1215 [mutual assent where acknowledgement form referred to arbitration provision in handbook].)

The First Acknowledgment that Mendoza signed mentions numerous topics in 12 paragraphs on two pages (i.e., his "pay plan," the at-will nature of his employment, meal and rest breaks, and other matters). It contains the following general reference to the Handbook: "You will be required to abide by all applicable rules and policies,

43

including but not necessarily limited to those set forth in the [Handbook]." Above the signature line, it stated, "I have read the [First] Acknowledgment and agree to its terms." Conspicuously absent was any mention of arbitration, alternative dispute resolution, or the Arbitration Policy.

The Second Acknowledgment consisted of 3 paragraphs and a signature line on a single page, in which Mendoza acknowledged receipt of the Handbook. The form stated: "In consideration of my employment with the Company, I hereby agree to read, observe, and abide by the conditions of employment, policies and rules contained in this Handbook." It contained the "quick reference" and "information only" language discussed above and stated that the Handbook and the policies contained therein "are not in any way intended as a contract of employment," that the Handbook represented "the entire understanding between" Mendoza and FTU and could only be altered by a "written agreement, signed by an officer of the Company." As before, conspicuously absent was any mention of arbitration, alternative dispute resolution, or the Arbitration Policy.

Nothing in the acknowledgment forms notified Mendoza either that the Handbook contained an arbitration clause or that his acceptance of the Handbook constituted a waiver of his right to a judicial forum in which to resolve his wage and hour claims. (*Sparks, supra*, 207 Cal.App.4th at p. 1520, quoting *Nelson v. Cyprus Bagdad Copper Corp.* (9th Cir. 1997) 119 F.3d 756, 761.) Since the Handbook "was informational rather than contractual" and FTU failed to call attention to the arbitration requirement in the acknowledgment form, Mendoza should not be required to arbitrate. (*Sparks*, at p. 1520.) Merely agreeing to abide by all applicable rules and policies and to "read, observe and abide by" the contents of the Handbook that "is designed for quick reference and general information" does not constitute a contract and does not bind the employee to arbitration. (*Id.* at p. 1521.) "To support a conclusion that an employee has relinquished his or her right to assert an employment-related claim in court, there must be more than a boilerplate arbitration clause buried in a lengthy employee handbook . . . . At a

44

minimum, there should be a specific reference to the duty to arbitrate . . . in the acknowledgment of receipt form signed by the employee." (*Id.* at p. 1522.) We agree with *Sparks* that the "increasing phenomenon of depriving employees of the right to a judicial forum should not be enlarged by imposing upon employees an obligation to arbitrate based on one obscure clause in a large employee handbook distributed to new employees for informational purposes." (*Ibid.*)

Employers rely on the first paragraph in the Second Acknowledgement, which stated: "In consideration of my employment with the company, I hereby agree to read, observe, and abide by the conditions of employment, policies and rules contained in this Handbook." The phrase "I hereby agree to read" the Handbook, like the promise to read the handbook in the acknowledgement form in *Esparza*, assumes that Mendoza had not yet read the Handbook when he signed the acknowledgment forms. And it was undisputed that Mendoza had not read the Handbook before signing any of the forms. There is "no basis to assume the employee agreed to be bound by something [he] had not read." (*Esparza*, *supra*, 2 Cal.App.5th at pp. 783, 790.)

Employers rely on the following sentence at the top of page 2 of the Handbook: "**THE POLICIES BELOW ARE A CONDITION OF EMPLOYMENT WITH THE COMPANY**" and on the last paragraph of the Arbitration Policy, which provides: "EMPLOYEE UNDERSTANDS BY BEING EMPLOYED BY THE COMPANY, AS A CONDITION OF EMPLOYMENT, THE EMPOLYEE [*sic*] AGREES TO THIS BINDING ARBITRATION POLICY, WHICH MEANS THE EMPLOYEE AND THE COMPANY BOTH GIVE UP RIGHTS TO TRIAL BY JURY . . . ." (Emphasis original.) Employers argue that since the Arbitration Policy was a condition of Mendoza's employment and Mendoza agreed "to read, observe, and abide by the conditions of employment, policies and rules contained in this Handbook" in the Second Acknowledgment, he entered into an express agreement to submit any claims against

45

FTU to arbitration.  Mendoza argues that a condition of employment that can be changed by the employer unilaterally at any time does not create a binding contractual obligation.

Employers do not cite any cases that support the assertion that by referring to arbitration as a "condition of employment," the parties entered into a binding agreement to arbitrate.  And they do not brief the effect of designating one or more of FTU's policies a "condition of employment."  Notably, the Handbook stated twice that "all terms and conditions of your employment may be changed or withdrawn at company's unrestricted option at any time, with or without good cause."  The Second Acknowledgement did not distinguish between "conditions of employment" and other policies and rules, lumping them all together in a single sentence, which stated:  "In consideration of my employment, I hereby agree to read, observe, and abide by the conditions of employment, policies and rules contained in this Handbook."

Employers also rely on *Harris*.  The arbitration agreement in *Harris* contained language that described arbitration as a condition of employment.  (*Harris*, *supra*, 248 Cal.App.4th at p. 378.)  But the court did not rely on that language in finding an agreement to arbitrate.  Distinguishing *Sparks*, the *Harris* court reasoned that the employee had agreed to arbitrate because (1) he had acknowledged receiving both the handbook *and the arbitration agreement* in the acknowledgement form, (2) the obligation to arbitrate was highlighted in the handbook's table of contents and in the text of the handbook; (3) the handbook's arbitration clause stated "without equivocation that receipt and agreement to the mandatory arbitration policy [was] 'an absolute prerequisite' to hiring and continued employment"; and (4) the arbitration clause provided " 'If, for any reason, an applicant fails to execute the Agreement to Arbitrate yet begins employment, that employee will be deemed to have consented to the Agreement to Arbitrate by virtue of receipt of this Handbook.' "  (*Id*. at p. 383.)  Unlike the situation here, the employer in *Harris* expected its employees to sign an arbitration agreement and its arbitration clause expressly addressed the situation where an employee fails to sign the arbitration

46

agreement. Based on this, the court concluded that *Harris* was "a stronger case for finding an agreement to arbitrate" than other cases where an acknowledgement form incorporated an arbitration agreement by reference. (*Id.* at p. 385.)

This case is distinguishable from *Harris* in many respects. Notably, FTU did not ask Mendoza to sign an arbitration agreement. Unlike *Harris*, (1) the acknowledgement forms here did not mention the Arbitration Policy or otherwise incorporate it by reference; (2) the Arbitration Policy was not highlighted in a table of contents and did not stand out from the other sections of the Handbook; (3) the "condition of employment language" at the end of the Arbitration Policy is not nearly as explicit or unequivocal as the language in the arbitration clause in *Harris*; and (4) nothing advised Mendoza that he would be deemed to have consented to arbitration by accepting the employment if he failed to sign an arbitration agreement. The documents in this case use the phrase "conditions of employment" almost interchangeably with other words like "applicable rules," "policies," "procedures," "terms," and "guidelines."

For these reasons, we conclude that the trial court correctly found that the parties had not entered into an express agreement to arbitrate.

### 2. *Whether an Agreement to Arbitrate May be Implied*

Employers argue that the parties entered into an implied-in-fact agreement to arbitrate. Employers contend that Mendoza assented to arbitration because he received a copy of the Handbook, which contains the Arbitration Policy, and worked for FTU after he received it. *Mitri*, *Ajamian*, and *Esparza* all rejected this argument. (*Mitri*, *supra*, 157 Cal.App.4th at pp. 1171-1172; *Ajamian*, *supra*, 203 Cal.App.4th at p. 806; *Esparza*, *supra*, 2 Cal.App.5th at pp. 790-791.)

Employers cite *Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 11 (*Asmus*) and *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 637 (*DiGiacinto*) for the proposition that "an agreement to arbitrate may be . . . implied-in-fact where the

47

employee's employment constitutes his/her acceptance of an agreement proposed by [the] employer." As the *Mitri* explained, "neither *Asmus* nor *DiGiacinto* . . . addressed whether an arbitration agreement *existed* between an employer and employee. [¶] *Asmus*, . . . , arose in the context of an employer's discontinuance of a management employment security policy but did not involve an arbitration agreement." (*Mitri*, *supra*, 157 Cal.App.4th at p. 1171.) The issue in *Asmus* was whether " '[o]nce an employer's unilaterally adopted policy—which requires employees to be retained so long as a specified condition does not occur—has become a part of the employment contract, may the employer thereafter unilaterally [terminate] the policy, even though the specified condition has not occurred?' " ' (*Asmus*, at pp. 5-6, fn. omitted.) "In holding an employer could do so, the Supreme Court recognized that 'California law permits employers to implement policies that may become unilateral implied-in-fact contracts when employees accept them by continuing their employment.' [Citation.] In *Asmus*, both parties agreed that the employees had accepted a unilateral contract by their performance. [Citation.] Thus, the question in *Asmus* was whether the unilateral contract, once formed, could be unilaterally modified or terminated by the employer." (*Mitri*, *supra*, 157 Cal.App.4th at p. 1171.) *Mitri* distinguished cases such as this one, where the issue is whether the documents prepared by the employer show that the parties entered into an express *bilateral* contract to arbitrate, and rejected the employer's argument that the handbook proposed a unilateral agreement to arbitrate, stating that arbitration agreements that compel both parties to arbitrate are expressly mutual. (*Id.* at pp. 1171-1172.)

The issue in *DiGiacinto* was whether the employer was liable for breach of contract when it notified an at-will employee of a prospective change in the rate of compensation and the employee continued to work after such notice. "In concluding that an employer is not so liable, the appellate court noted, 'the majority line of cases supports the proposition that as a matter of law, an at-will employee who continues in the employ

48

of the employer after the employer has given notice of *changed terms or conditions of employment* has accepted the changed terms and conditions.' " (*Mitri*, *supra*, 157 Cal.App.4th at p. 1172, citing *DiGiacinto*, *supra*, 59 Cal.App.4th at pp. 631, 637.) *DiGiacinto* did not involve arbitration. And, unlike *DiGiacinto*, this case does not involve notice of a *change* in the terms of the employment.

Employers rely on *Craig*, *supra,* 84 Cal.App.4th 416. After the employee in *Craig* had worked for the employer for 12 years, the employer established a four-step dispute resolution program that culminated in arbitration. (*Id.* at pp. 418-419.) The employer moved to compel arbitration and presented evidence that it had sent a memorandum to all employees, including the plaintiff, in both 1993 and 1994, advising them of the new dispute resolution program. The memorandum explained the purpose of the program and emphasized that everyone would be bound by it, stating: "The enclosed brochure explains the procedures as well as how the Dispute Resolution Program works as a whole. Please take the time to read the material. IT APPLIES TO YOU. It will govern all future legal disputes between you and the Company that are related in any way to your employment." (*Id.* at pp. 419, 421.) The "enclosed brochure" explained the program's four-step progression—from access to management, to an informal conference, to mediation, to arbitration. It explained what arbitration is, the role of the arbitrator, the procedure for obtaining arbitration, and the cost. (*Id.* at p. 419.) The appellate court rejected the employee's contention that the evidence was insufficient to show she entered a binding arbitration agreement with her employer. The court found substantial evidence that the employee received the memorandum and the brochure in 1993 and again in 1994, that she continued to work for the employer until 1997, and that "she thereby agreed to be bound by the terms of the Dispute Resolution Program, including its provision for binding arbitration." (*Id.* at p. 422.)

This case is distinguishable from *Craig*. The documents that created the implied agreement to arbitrate in *Craig* consisted of (1) two memoranda that notified the

employee of the new alternative dispute resolution program, and (2) a brochure that describe the program and the procedures for resolving disputes, including arbitration, in greater detail. The memoranda in *Craig*, which are analogous to the acknowledgement forms in this case, expressly mentioned the dispute resolution program and advised the employee that the program applied to her and "will govern all future legal disputes . . . related in any way to [her] employment." (*Craig*, *supra*, 84 Cal.App.4th at p. 419.) Unlike the memoranda in *Craig* that provided clear notice of the alternative dispute program, the acknowledgment forms here did not mention the Arbitration Policy.

*Ajamian* rejected the argument that the employee's continued employment after the receipt of the employer's handbook constituted acceptance of and consideration for an agreement to arbitrate. (*Ajamian*, *supra*, 203 Cal.App.4th at p. 806.) The court reasoned that unlike the employee in *Craig*, who "was twice sent brochures describing the company's dispute resolution program, with all-caps notices which emphasized that the employee was bound by the program," Ajamian was never sent such a notice and the employment agreement "referred generically to 'policies,' not to arbitration." (*Ajamian*, at p. 806.)

The only case to apply the implied-in-fact contract theory to an arbitration agreement in an employee handbook was *Harris*, *supra*, 248 Cal.App.4th at pages 383-384. But the court did so after it had already concluded that the parties had entered into an express agreement to arbitrate. The court relied on language in the handbook that expressly addressed the effect of the employee's failure to execute the written arbitration agreement in the handbook and provided that upon commencing the employment, the employee was deemed to have consented to arbitration. (*Id.* at pp. 383-384.) There is no such provision in the documents at issue here.

The *Esparza* court rejected the employer's contention that the employee had impliedly agreed to the arbitration provision in the employee handbook because she was expected to read the handbook within a week and continued to work for the employer

50

after that week.  (*Esparza*, *supra*, 2 Cal.App.5th at p. 790.)  The court distinguished *Esparza* from *Harris*, reasoning—as we have—that there was no contractual language in the handbook in *Esparza* that provided that if the employee voluntarily continues to work, she " 'will be deemed to have knowingly and voluntarily consented to and accepted' " the terms and conditions in the handbook's arbitration agreement.  (*Ibid.*)  In rejecting this point and distinguishing *Harris*, the court relied on language in the welcome letter, which that declared that the handbook "did not 'create any legally enforceable obligations' " and in the acknowledgment form, which stated that the handbook provided "general information" about the employer's policies.  (*Ibid.*)  The court reasoned that there was no requirement that the employee agree to any of the employer's policies.  (*Id.* at pp. 790-791.)  The Second Acknowledgement and the Handbook here likewise declared that they did not create any binding obligations, were designed for quick reference, and provided general information.

Since this case is distinguishable from *Craig* and *Harris*, and considering the other authorities discussed above, we reject Employers' contention that Mendoza entered into an implied-in-fact agreement to arbitrate by simply receiving a copy of the Handbook and working for FTU.[9]

---

[9] In light of our conclusion, we shall not reach Mendoza's contention that "fraud in the execution results in a lack of mutual consent and precludes formation of a valid arbitration agreement."  In addition, we shall not consider Employers' contention that the Arbitration Policy is not unconscionable, either procedurally or substantively.  Since Mendoza did not rely on an unconscionability defense, either in the trial court or in his brief on appeal, and the trial court did not reach the unconscionability issue, we decline to address whether the Arbitration Policy is unconscionable as a matter of law.  We note, however, that after this case was fully briefed, the California Supreme Court construed an arbitration agreement that contained language very similar to the Arbitration Policy in this case and found it unconscionable under the circumstances in that case.  (*OTO, supra*, 8 Cal.5th at pp. 118-119, 126-137.)

51

Since the parties did not enter into either an express or an implied contract to arbitrate, the trial court did not err when it denied Employers' motion to compel arbitration.

## IV.    DISPOSITION

The trial court's order denying the motion to compel arbitration is affirmed.

_____
                  Greenwood, P. J.

WE CONCUR:

_____
    Elia, J.

_____
    Grover, J.

Mendoza v. Trans Valley Transportation et al.
No. H044372

Filed 3/1/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOSE MARIO MENDOZA, | H044372 |
| | (Santa Clara County |
| Plaintiff and Respondent, | Super. Ct. No. 1-15 CV281073) |
| | |
| v. | |
| | |
| TRANS VALLEY TRANSPORT et al., | |
| | |
| Defendants and Appellants. | |

THE COURT:

     The written opinion in the above-entitled matter filed on February 4, 2022, was not certified for publication in the Official Reports.  Upon application of respondent Jose Mario Mendoza and the California Labor Commissioner and good cause appearing, it is ordered that the opinion shall be certified for publication pursuant to rule 8.1105(b) of the California Rules of Court.  It is therefore ordered that the opinion be published in the Official Reports.

     In compliance with California Rules of Court, rule 8.1120, the Clerk shall transmit the request for publication and a copy of this order to the Supreme Court.

 

_____
Greenwood, P. J.


_____
Elia, J.


_____
Grover, J.

1

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.: 15CV281073 |
| --- | --- |
| Trial Judge: | The Honorable Peter H. Kirwan |
| Attorneys for Plaintiff and Respondent,<br>Jose Mario Mendoza: | Karasik Law Firm<br>Gregory N. Karasik |
| | Law Offices of Santos Gomez<br>Santos Vasquez Gomez |
| Attorneys for Defendants and Appellants,<br>Trans Valley Transport et al.: | Brothers Smith LLP<br>Horace Green<br>Robert Joseph Brothers<br>Tonya Draeger Hubinger |
| Attorneys for Cross-Defendants,<br>PeopLease, LLC: | Ellrod, Ramirez, Trester LLP<br>Tracie Lynn Childs |
| | Manning & Kass, Ellrod et al LLP<br>Alfred Michael DeLaCruz |
| Attorney for the California Labor<br>Commissioner: | Jessica Fry |

H044372
Mendoza v. Trans Valley Transport et al.

2